of the Federal Defender's Office on behalf of Mr. Reza-Ramos, and I would like to reserve three minutes, excuse me, five minutes for rebuttal. Mr. Reza-Ramos' conviction must be reversed for several reasons. First, the government presented insufficient evidence of the victim's Indian status, which was a jurisdictional element in this 1152 case. And even if the evidence was barely sufficient, the district court committed a plain error in failing to define Indian, because the jury had absolutely no guidance on how to determine whether the victim was an Indian under the complicated multifactor test. Time permitted, I'd also like to address the district court's limitation of cross on Brant Cassidy, which was critical evidence to the government's case, because that DNA analysis was the only evidence linking Reza-Ramos to the blood-soaked clothes apparently worn by the killer. The prejudice from that limitation was compounded by the numerous improprieties in closing argument, many of which also concern the DNA evidence. And, time permitting, I'd like to address the improper use of Arizona's third-degree burglary statute as a predicate for Federal felony murder when the common law definition should be used. I'd like to first address, and I'm also obviously willing to answer questions on anything the Court has, I'd first like to address the victim's Indian status. This got before the Court, as I understand it, through your Rule 29 motion. Is that correct? Yes, Your Honor. I just want to make sure you preserve the issue before you get into it. Yes, Your Honor. Defense counsel made a general motion for acquittal under Rule 29. He explicitly said he was making a general Rule 29 motion. Then he went on to address specific arguments in addition. But his general motion was sufficient to preserve the issue. And I did file a Rule 28J response last week on that that I hope the Court received. But even if it hadn't been preserved, it would still be plain error under this Court's decision in Cruz, because failure to establish jurisdiction for a crime is plain error. It affects the public integrity of the proceedings. So we have before us a problem that the statute requires just one of the two, the victim and the defendant, to be Indians, Native Americans. Yes, Your Honor. And your argument is we all know that the defendant wasn't because of the facts, and so the issue is whether or not there was sufficient proof by the government of the jurisdictional requirement that this person was an Indian. Yes, Your Honor. The defendant was not alleged to be an Indian. Can you explain where in the statute that's a jurisdictional requirement? I'm looking at 1152, I guess. As this Court's aware, Indian jurisdiction law is a patchwork, as this Court has described it. But under the law, if two non-Indians are involved, the Federal court has no jurisdiction. The State court has jurisdiction. The Supreme Court said that, I think, in McBratry, something like that. McBratney, and it's been followed ever since. McBratney. And so is that jurisdictional? Because the Supreme Court has now instructed us that jurisdiction has to do with what Congress authorizes in a statute and the use of jurisdiction, the word jurisdiction, it now does not mean authority or judge-made law. It now has disapproved. What do we do with that? Well, Your Honor, that is still the law of the land. It's still the law of the circuit. This Court, in Bruce, as recently as Bruce said, that there is no jurisdiction. The State court has jurisdiction if two non-Indians are involved. That wasn't raised, though. That wasn't the issue in Bruce, though, right? Well, in Bruce, the Bruce courts explicitly distinguished its posture in which the defendant's Indian status was an affirmative defense from the situation in Keyes and Ramirez where the government had to prove beyond a doubt, a reasonable doubt, that the victim was an Indian. And that is how the Court approached the issue in Keyes and Ramirez. They considered the victim's Indian status to be an element that the government had to prove beyond a reasonable doubt. But the exception discussed in Bruce does not apply. The exception in the statute, 1152, is when an Indian is involved with an Indian. And Mr. Reyes-Ramos is not claiming that exception. He's not claiming that he's an Indian. He's not claiming anything about himself. In Ramirez, I mean, there's some confusion in the cases, as you know, in terms of how the statute is used, and there's also some distinction in the other circuits. But as I read Ramirez, it was looking head-on at the district court's jurisdiction under 1152 and whether or not the government had put on enough evidence to meet that as involved here, the Tohono O'odham tribe. Yes. We're in exactly the same posture where the government had to prove beyond a reasonable doubt that the victim was an Indian. And in Ramirez, the Court considered that and considered the sufficiency of the government's proof and found under the facts of that case that it was sufficient. But under the facts of this case, the evidence was not sufficient. So the go ahead. I'm sorry. Go ahead. Well, one of the first things, of course, we then look to Bruce factors and Maggio and Cruz. We have a series of cases that lay out. So leaving aside right now your second point, which is how could you figure this out if you didn't know what an Indian was for purposes of the jury instructions. Yes, Your Honor. But in terms of the degree of Indian blood and whether this gentleman was a member an enrolled member of a federally recognized tribe, is there any evidence on the degree of Indian blood? No, Your Honor, except perhaps a notation on the death certificate that says 4-4. But the jury – excuse me, Your Honor. That – because my recollection was that the death certificate was in evidence and that did indicate his blood. Well, the death certificate was introduced as a business record to show cause of death. The witness, Dr. Winston, who provided foundation for that death certificate, specifically said he could say nothing about the demographic information. So the jury should have known and would have known to disregard that. But even aside from that, the government had to prove a blood quantum from a federally recognized tribe. President, if you're right on that, then the rest doesn't matter. Well, under this Court's recent opinion in Zepeda, that's correct. In Zepeda. Zepeda is the nail that was far greater into the coffin than Bruce. Yes, Your Honor. Under Zepeda. Even though we fully know that it was and could take judicial notice, Zepeda writes that it has to go to the jury, and so we can't even do it at all. Let's go back. That's your argument? Yes, Your Honor. But even aside from that. You're not suggesting. Well, let's say someone said on the stand, yes, actually, he has high degree of Indian blood and he's a member of X tribe. You're not suggesting that you could somehow take judicial notice of X tribe being a federally enrolled tribe. You would need some evidence of someone to stand up there from the tribe or the Department of Interior or somebody to say, this tribe is a federally enrolled tribe, correct? Yes, Your Honor. That's the ruling of Zepeda. But even apart from Zepeda, we have insufficient evidence here because this did involve the Teo tribe. The only testimony here was that, according to his friend, he was a Teo member. But this Zepeda issue before us, I don't remember it being argued. I don't think it was raised to the district court. Was it raised to us? Yes, Your Honor. It's raised in the opening brief and in the reply brief, and it's certainly an argument in support of this claim which was raised. But since this involves the Teo tribe, we had testimony that Mr. Flores was born in Mexico. So we have no way for the jury to draw a rational inference that even if he is associated with the Teo tribe, that he is associated or that his ancestors were associated with the federally recognized Teo tribe. So that's an important distinction. And even if you – even apart from the rule in Zepeda, we have insufficient evidence here of blood. Moving on to the second prong of the Bruce test, we also have insufficient evidence of tribal or government recognition as an Indian. As I said, Ms. Zavala simply testified that he was a Teo member. This Court's cases, including this Court's case in Maggie, have acknowledged that people can be considered members loosely of a tribe without being enrolled. So we have absolutely no evidence that he's enrolled in the Teo tribe. As the government has conceded, we have no evidence of tribal assistance – excuse me, receipt of assistance from the tribe. We have no evidence of the benefits of tribal affiliation. The government points to, again, on this death certificate that wasn't admitted for this purpose, a notation that he was buried in the Fresno. Kagan, He was buried at the tribal cemetery. Yes, but we have no testimony that it was a tribal burial, that you have to be an Indian to be buried there, or that that's even on the reservation. And the evidence is that Mr. Flores only lived on the reservation for a very short period of time, and he was still going back and forth to Tucson. But you said it was a short period of time. I gathered it was years. No, Your Honor. The evidence is that he was there helping out at the ranch from approximately October 2002 until his death in March 2003. But even then, he was going back and forth to Tucson. Now, I was a little confused. There was a – he was married before, and he was a widower. Yes, Your Honor. And was there evidence of whether the wife was a member of the Teo tribe? No, Your Honor, not to my knowledge, not to my recollection. I had a feeling that they lived on the reservation. That's why I was asking the question. Your Honor, the government argued in its brief that they lived in cells. The basis for that is a snippet of a sentence that says, describing the death of his wife, that said she was coming home and they lived in cells. We have no idea how long they lived in cells. And you don't have to be an Indian to live in cells. Cells is a good-sized town, and approximately 5 percent of the people there are not Indians. So there's very, very little evidence. The only other evidence – It is on the reservation. It is on the reservation, yes. What about the second woman, his girlfriend? Yes. She said he was – she gave evidence, but it wasn't in the context where I could decide how long this relationship had been or what she was saying – what she was trying to convey with her statement. Yes, Your Honor. I mean, he had obviously been living with her in Tucson for some time before he went back to help on the ranch. Oh, she lived in Tucson? She lived in Tucson. Oh, I thought from the thing she lived in on the reservation. No, Your Honor. She lived in Tucson and he lived with her and worked in Tucson. He had worked on the ranch for some unspecified period before that. But we really have, aside from those 5 months that he was there, 4 or 5 months before his death, we really have no indication from the evidence how long he was on the reservation or if he was on the reservation. And this Court in Cruz found insufficient evidence of Indian status when the defendant had lived on the reservation for 4 years as a child, and then again before the offense. He attended school on the reservation. He'd been prosecuted by the tribe, and he was a firefighter for the Bureau of Indian Affairs. We simply don't have that kind of evidence here, and this Court found that insufficient in Cruz. And in Maggie, similarly, we had much more evidence of affiliation with the tribe in receipt of benefits, and we just don't have that evidence here. Would you like for me to further discuss the failure to instruct? Because even if the evidence was sufficient, the jury had no idea how to apply this test. And it's obviously very complicated. This Court has described it as formidable and very difficult to determine whether somebody's an Indian. Yeah. I mean, I think one of the difficulties is, is that people have in their head what an Indian is, particularly any of us who've lived in states where there's a large native population. But that may not comport with the legal definition. Yes, Your Honor. And they heard Ms. Zavala say that he was part of a tribe, and that was, I'm sure, enough for them, because they didn't know how to address it. And it is plain error under this Court's precedent to fail to define a term that's essential to the understanding of an element, and that's what happened here. And even in Zepeda, Judge Watford said it was plain error to fail to define Indian, although under the facts of that case he didn't think it was prejudicial, whereas here it was, because a rational juror jury who knew the definition in all likelihood would not have found sufficient evidence that Mr. Flores was an Indian. Would the Court – does the Court have any more questions on the Indian status issues, or should I move on to the confrontation issue? It looks like you can move on. You wanted to save 5 minutes. You're at 6. Yes, Your Honor. I'll just briefly touch on the confrontation issue. In short, it was critical to evaluate Cassidy's evidence. And as I described, that was the linchpin to the government's case. It was the only evidence tying Mr. Reza Ramos to the killing itself, the only direct evidence of that. There were many reasons to think it was unreliable. DPS was an accredited lab, had not – had tested the same clothing, but had not found Mr. Reza Ramos's DNA. All of a sudden, this privately hired, unaccredited lab does find Mr. Reza Ramos's DNA. DPS – excuse me, DPS is required as an accredited lab to measure the amount of DNA, whereas Brent Cassidy did not do that. And the risk is, if you don't measure, you may engage in this sort of – this low copy number testing. Which everybody, even Cassidy, agreed was unreliable, even though he insisted he did not do that. And the judge left it up to the jury. There was a conflict. Well, yes, but the district court did not allow defense counsel to cross-examine on that and to add insult to injury. The district court said, you can ask him, but if he denies it, you just have to leave it at that. And that allowed the government to capitalize on redirect and have Mr. Cassidy say he didn't engage in this unreliable LCN testing. I thought that the LCN so-called testing is just a methodology, and the district court allowed extensive cross-examination on methodology. Why does it matter if that term is used or a label is used if you can try and impeach the method that was used? Well, Your Honor, Cassidy would have agreed that LCN testing was unreliable. So defense counsel should have had the opportunity to confront Mr. Cassidy and say, well, don't you agree, because of the drop-in, the drop-out, all of the indications in your testing and the fact that you didn't measure, you could have engaged in this unreliable testing, and Cassidy would have had to either admit it or deny it in the face of all of this information and be discredited in front of the jury. But didn't the cross-examination go into the ways in which it was unreliable or try to confront him on that? I guess it seemed like you were focusing on the use of a label, and I wasn't sure why excluding the use of the label made a difference. Well, it made a difference because it was that label that it is considered unreliable, and even Cassidy would have had to admit that. And in addition to this, as I said, the government was able to capitalize and that bolstered Cassidy's testimony, and the prejudice from all the improprieties in closing argument just compounded it. And I'd like to reserve my time. I don't want to impede on your rebuttal time, but quick question. Sure. If we were to disagree with you on all your arguments and to uphold the murder, premeditated murder conviction, would vacating the felony murder have any effect on his sentence? Not on the sentence, but it does need to be addressed, because he was convicted of felony murder. There's a verdict form that he was convicted of felony murder. And, of course, if you reverse on anything that requires a new trial, there needs to be guidance to the court. But we don't know what's going to happen on a 2255. He could go and raise issues related to the felony murder. I mean, the answer is it wouldn't have any immediate effect on his sentence. Not on his sentence, but it does need to be addressed. Thank you, Your Honor. Thank you. May it please the Court. My name is Bruce Ferg, assistant United States attorney on behalf of the government in this case. I'd like to suggest that the bulk of the previous argument has taken you down the wrong path, because it essentially ignores the fact that no less than six cases from this Court say that the Indian status under 1152 is an affirmative defense. Does any one of those say that with respect to the victim? None of them says, oh, by the way, this affirmative defense. Now, my question is, does any of them say that with respect to a victim, that it's an affirmative defense? It hasn't arisen. That kind of a case like this one has not arisen. So therefore, it's a little bit misleading to stand up and say that she's taken us down the wrong path when, in fact, not a single one of our cases has actually addressed this precise issue. Well, with due respect, no, you don't have to have a case when you have all of the cases saying 1152, this statute is an affirmative defense without distinguishing the individual.    And it's a statutory individual. And saying it applies only to the individual. You just can't pull a sentence out of a case and say it applies everywhere. As I understand it, 1152 is valid if there's an Indian and a non-Indian that involve. But I don't think you can take the case much further than that and say that in every 1152 case, they have to have a separate affirmative defense. I mean, the case just doesn't say that with the facts. Where do you have a case with these facts where we've said that? I don't have one, honestly. But again, I think when the language of the cases and what it goes back to really is the differing structure between 1152 and 1153. Which is basically why Zepeda and all of that really isn't applicable here. I've offered you the two statutes in the appendix of my brief. And 1153 starts out very clearly making Indian status an element. It says, an Indian who commits any of these kinds of crimes. But when you look back at 1152, first of all, two paragraphs, and it says, except as otherwise expressly provided by law, the general laws of the United States extend to Indian territory. That's the basic thing that 1152 does, applies the general laws of the United States to Indian territory. Then the second paragraph gives you some particular exceptions, which go to if it's an Indian on Indian, basically, which is kind of the corollary to 1153, which came later. So what we have in 1152 is a general statement of territorial jurisdiction. The general laws of the United States apply in Indian country. And then exceptions to that, some enumerated, but also it says, as otherwise provided by law. And what the case law has done is say, there are other exceptions. For example, even though under its general wording, it would be applied to white on whites, McBratney and Mull say no, that's not what it's intended to do. McBratney said it was jurisdictional, and then Ramirez seemed to indicate it was a jurisdictional fact, which there needed to be a sufficiency of the evidence, a plain error review. What do we do with that? Well, I think it's the same problem that you actually alluded to earlier, is that this term jurisdictional, particularly in the older cases, has kind of gotten thrown around. And I think here, it's trying to be made jurisdictional by calling it an element. But an affirmative defense, which is what the court has called it, isn't an element. It's something that the defendant has to raise. And that's what he essentially is trying to do here. What do we do with Ramirez, which is not such an ancient case? It's 2008, has a heading called the District Court's Jurisdiction under 1152. And then it talks about whether there was Indian status or not. And at the very end, it says, We hold the District Court correctly ruled that it had jurisdiction to hear the case. So it seems that we have crossed this bridge, wrongly or not. Well, it becomes jurisdictional or an element if it's appropriately raised, because Hester and Bruce and all of those cases say the burden is on the defendant to put this in issue, and then if he does, then this is what the government has to prove. That may be, but when it's a jurisdictional element and there's no jurisdiction, we have no power to decide the case. We must reverse and vacate and send it back. And we said in Ramirez, it's a jurisdictional issue. And it's a jurisdictional issue, just like the amount pledged or whatever. If it's a case involving people claiming that we have jurisdiction because of the people involved, they have to plead it. They have to show citizenship in two different countries. If it's not there, we can't have power. Now, once it's jurisdictional, I don't know how you get around saying, oh, but even if it's not, even if no one, as long as no one raises it, there's no problem. That's not jurisdiction. Well, I guess we're debating, if you will, whether, in fact, it is jurisdiction. No, we're asking very hard questions of counsel, because at least one-third of the Court is very troubled about the jurisdiction of the case, and I want to give you your best shot at the issue. Well, I appreciate that. Basically, as if it did anything, Zepeda showed us how complicated Indian jurisdictional issues are, and the fact that there may be language in prior cases that people don't always notice and deal with. And I would suggest to you that that's exactly what has happened in Ramirez with regard to the language in these six other cases that all say 1152 is an affirmative defense. Let me ask you, just so we can be clear, in the six other cases, was it the defendant's status as an Indian that was at issue? In the ones where it was actually an issue, and it wasn't just a matter of quoting prior case law, it was a defendant, yes. Okay. So the one cases we have where the question is the victim's status, that's keys in Ramirez, correct? Yes. That was the question. But again ---- Well, let's go beyond. You know, we take your point. There's some sentence in six cases where the defendant's status is an Indian, and there's a sentence in there that you want us to transform into affirmative defense. But let's just take it now to the evidentiary question, because I doubt that we're going to have a meeting of the minds until we all reread the cases again. What evidence was there that this person was of Indian blood, of a federally recognized tribe? The evidence of his Indian blood was primarily from Ms. Zavala, this lady who had lived with him, and she obviously knew him intimately, was herself, according to her own testimony, half and half Papago, excuse me. She's not related to him, though, in a blood sense, correct? No. So it doesn't matter if she's 1 percent or 200 percent Indian, it doesn't devolve to him. Just in the sense that here is someone who is in a position to know and did say that he was basically 4-4 T.O. But what's her – what's the – what evidence do we have that she's in a position to say that, just because she's an Indian? No, because she lived with him for 5, 7 years and knew his prior history, including the fact that he had, in fact, lived on a reservation with another lady who was a T.O. And – So all of that still doesn't say anything about the degree of Indian blood. So my question is a simple one. What basis did she – She knew his personal history. And how do we know that? I mean, what's the testimony we would look – It's something the jury could reasonably infer that when you're living with someone, you know, for 7 years, that you know, you know, what their ethnic background is, particularly when you are Indian yourself, as she said that she was, and he's on the reservation, he's doing work there, and all the other ties he had. He spoke T.O. to Narcho, the fellow who's running this ranch, on the reservation. So assuming that we're following Ramirez, and Ramirez looked at this so-called jurisdictional element under a sufficiency of the evidence. So are we, therefore, to look at the evidence that was presented under this, like, Neville's standard, so that we take all inferences in favor of the government and all that, or is there some other standard that's applicable here? I would suggest that it is, but I'll have to be candid with you. If you're going to import the strict Zepeda interpretation of the four-part test, then we didn't need it, because that simply wasn't put in issue, nor was the Zepeda even decided at the time that this case was tried several years ago. So. It's four years after, but it looks like it looks backwards, because the way Judge Piaz wrote it, it said, you can't even take judicial notice. It has to go to the jury. It's pretty hard not to say it's going to apply backward. Tell me on the evidence part, what is it that we could look at to be able to, in writing an opinion, that this tribe, Teal, is federally recognized? Because it was not raised, the evidence wasn't presented. So there's no evidence. You agree there's no evidence on that. And you also agree that under Zepeda, we can't take judicial notice of it. Well, there was no question that the offense occurred on the reservation, and only federally recognized tribes have reservations. Well, I. That's a pretty good. That's not bad, is it? Yeah. That's a pretty good inference that you've made. But what about the, you know, the point your counsel made, though, about the blood said that this death certificate was admitted or, you know, just for the purposes of the fact of death, and that the doctor said he couldn't verify or vouch for the ethnicity question. So then that, is that sufficient evidence if he sort of disclaimed that? He was simply describing a source, which was Ms. Zavala, who was common law, if you can. I'd also like to emphasize that what she testified, as far as her living in Tucson, she was a nurse there, had a job there, was that Mr. Flores, the victim, would, he preferred living, or enjoyed living, I should say, out on this ranch on the reservation. She didn't care for it. But he would come continue frequently from there into Tucson, even during this last six months or so when he was left in charge after the owner, Mr. Quisto, had died. But we no longer have rules that Indians can only stay on reservations, or that you're only an Indian if you are on a reservation. Obviously, people can travel back and forth, including going from Sells and the Quisto Ranch to Tucson without giving up your Indian status. So it's really kind of a non sequitur here. Do you have any, do we have any evidence of actual enrollment in a tribe? Because there is a distinction made both in Indian law and in the cases between enrollment and being a member. Well, there is that distinction drawn, but it's not one that says that you must have absolutely this kind of paper. What it says is that either one of these kinds of types of evidence isn't necessarily sufficient, but it's certainly probative. And at the point of my brief. Like the dance festivals. Let me go back to a question you answered earlier. Do you take the position, because it's called a reservation, that therefore we can say it is a government approved reservation? I think that that's certainly something the jury could infer. And when we're talking about sufficiency of the evidence, that's what we're talking about, is reasonable inferences from the facts that are put in front of them. That goes to the jury instruction question, then. How would the jury know what to infer if it didn't know what the definition of an Indian is, like a legal definition? Again, if we're importing the entire Zepeda gloss on Bruce, then it wouldn't have been adequate. Let's leave off the Zepeda gloss. Just all the rest of it, which is basically, you know, membership, blood attributes, and then the sort of social structure. How would the jury know that those were benchmarks that one might look at to tell them what an Indian is? They wouldn't. But again, this is basically the defendant's own problem, because he offered the instructions that simply said you have to find that the victim was an Indian without any kind of further explanation. This is all being raised post-trial, on appeal, I should say. So it is a plain error problem. Yes. I think we all agree with you on that. Yes. And, again, because, you know, I don't want to irritate the Court, but I think that this goes back to the fact, what are you going to do with those six cases which call this an affirmative defense? In other words, there has to be some kind of a distinction drawn between those cases which basically preserve my case, because he didn't raise it and didn't put me to the burden of presenting any evidence on that fact, and the fact that they simply didn't refer to a situation exactly like this, that's the kind of situation that this Court frequently distinguishes. Sure, you have an example of A, but that doesn't mean that when you have a general rule like 1152 is an affirmative defense, that somehow there is an unspoken exception to that if there is some other factual situation. I think the better question might be not what are we going to do with those six cases. What are we going to do with Ramirez? I mean, maybe you can tell us how, in the face of Ramirez, which does relate to an Indian victim, are you saying that you think there's a conflict in the cases, or is there a way, in your view, we can get to your result and still use Ramirez? I think that you can. As I indicated, the question of whether or not 1152 constitutes an affirmative defense was not even raised, and so it wasn't addressed. Now, obviously, to the extent that the government, for whatever reason, decided not to or wasn't aware of that issue, then it said, okay, this is our burden. We'll meet it, and then the question became was, did they in fact meet it? Was the evidence sufficient? So that's in no way inconsistent with the idea that 1152 is, in fact, an affirmative defense. As a matter of fact, Bruce talks about this in some length and even talks about, hey, when you choose to charge under 1152, you, the government, are actually having to prove less elements because it's an affirmative defense. And so it's saying that's not for our purposes at the stage it's an affirmative defense and element, and therefore couldn't be jurisdictional, obviously. Maybe we were wrong in labeling it an affirmative defense in the defendant context, because there are circuits who would say it's jurisdictional for both defendant and victim. Well, again, the only cases that have addressed it have been ones where the defendant's status was an issue. So, again, there's no real inconsistency in saying, yeah, logically, if you call it an affirmative defense, it applies across the board. Because really what the defendant is trying to do is to create an exception to 1152. He's trying to extract himself from 1152, which deals with what Bruce called interracial crimes. He's trying to say, oh, you didn't show that there was really a difference. And so I'm out of here. You can't deal with me. So it's his burden. As a matter of fact, in the reply brief, the defendant acknowledged when a party attempts to take advantage of an exception to a rule, which is what he's basically trying to do, it's his burden to show that and not lie back in the weeds and say, oh, you didn't show the fact, you didn't contradict my affirmative defense. That's not our burden. And I see my time's almost up here. I can address the other issues. Basically, there is no significant issue with regard to the DNA admission. LCM is something which is basically a title, and everybody defines it differently. But what Dr. Cassidy indicated was, our procedures are specifically designed to avoid that by utilizing enough material that we stay above the level, 75 RFUs, where these so-called stochastic effects, like allele drop in and drop out, can appear. And so, yes, not with regard to that technique, but with regard to some oversights in reading the material, he said, yeah, I made a mistake there. But there is the district court, and this is a finding of fact, subject only to clear error review, said there is no LCM testing done here. So I'm not going to allow you to go into it. It's simply not relevant, and that's why it was an appropriate exercise of discretion to exclude that evidence. Now, I'd be happy to talk about any of the other issues. I think you've hit the key ones. Thank you very much. To pick up on that last point, whether Dr. Cassidy engaged in LCM testing and whether his testing was, therefore, unreliable was a question of fact for the jury. I think Daubert makes it clear that it's up to the jury to decide whether the expert is using a reliable methodology, and that should be subject to wide-open cross-examination. And cross-examination was limited here, as I discussed, and it allowed the government to capitalize on redirect and bolster Cassidy's testimony. I'd also encourage the Court to take a look at the closing argument. This is an unusual situation where you have at least ten improprieties in closing argument that relate to one another, a claim that there was no challenge made to the DNA testing, an assertion that defense counsel was trying to mislead the jury. So the sum total of those improprieties, along with what happened with the restriction on Cross, is very significant. Turning back to the Indian issues, Mr. Reza Ramos was not claiming the benefit of an exception to 1152. If you read the text of 1152, it does not apply when an Indian is involved with an Indian. He was not claiming to be an Indian. He was not claiming anything about himself. Hester made very clear that the reason why, at least in this circuit, and as you pointed out, as Your Honor pointed out, this is not the rule in all the circuits, but in this circuit, if the defendant raises his own Indian status as an affirmative defense in an 1152 case, then that's not an affirmative defense, because the defendant is in a much better position to know about his own Indian status, and that's not true when the victim's Indian status is at issue. And as I stated, if the defendant is not alleged to be an Indian and the victim is, the victim must be an Indian to invoke Federal jurisdiction. Is that true of the other five cases to which counsel makes reference? Yes, Your Honor. They all, to my knowledge, involved the defendant's Indian status, and Ramirez involved the victim, and this Court characterized it as a jurisdictional element. I'd also like to briefly address, Ms. Zavala did not testify about Mr. Flores's degree of Indian blood. We can surmise that maybe she gave the information on the death certificate, but she was not questioned about that. We don't know how she knew that. We don't know really whether she was even the source of that information on the death certificate. We don't know for sure because there was no questioning or argument on that. And again, when the government, when something is an element that the government must prove, the defendant has no burden whatsoever. The burden is on the government to prove it. Thank you. Interesting legal issues that you've both raised. The case just argued, United States v. Reza Ramos, is submitted. I thank you both for your arguments this morning.
judges: Wallace, McKeown, Ikuta